**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DEBORAH HAGEDORN** | ) | **CASE NO.  1:15 CV 1381** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **DAVID CATTANI, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | **MEMORANDUM OPINION** |

This matter is before the Court on the Motions for Summary Judgment filed by Defendant, David Phillips (Docket #43), and Defendants, David Cattani and Geoffrey Esser (Docket #44).   Pursuant to Fed. R. Civ. P. 56, Defendants seek summary judgment as to all of the claims asserted by Plaintiff, Deborah Hagedorn ("Ms. Hagedorn").

I.      **Summary of Facts**.[1]

At all times relevant to the allegations set forth in Complaint, Ms. Hagedorn was a resident of the Village of Timberlake, Ohio ("the Village").  The Village is approximately a quarter square mile in area and has between six and seven hundred residents.  (Deposition of David Cattani ("Cattani Depo.") at pp. 18-19.)  Ms. Hagedorn and her husband moved to the

---

[1]      The facts as stated in this Memorandum Opinion and Order are taken from the Parties' submissions.  Those material facts that are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving Party.

Village in 2001 and lived within several houses of Defendant, David Cattani ("Mayor Cattani"), who served as Mayor in the Village during the time period in question.  (Brief in Opposition at p. 2.)

Ms. Hagedorn alleges that Defendants – Mayor Cattani, Former Chief of Police David Phillips, and current Chief of Police Geoffrey Esser – caused unwarranted criminal charges to be filed against her on several occasions in retaliation for criticizing Village officials and independently investigating improprieties within the Village and its Police Department, in violation of her First Amendment rights.

A.       **Investigation of Village Finances and Administration by Ms. Hagedorn.**

Over a period of several years, Ms. Hagedorn and several other Village residents became concerned with the manner in which Village officials were performing their jobs, particularly with regard to the fiscal management and oversight of the Village Police Department.  (Amended Complaint at Paragraph 25.)   In late 2012 and early 2013, Ms. Hagedorn began to independently investigate her concerns, observing the daily activities of Village Police Officers and making numerous public records requests, pursuant to Ohio Rev. Code § 149.43, for information pertaining to the operation, management and finances of the Village.  Ms. Hagedorn directed her public records requests, via email,[2] to Village Clerk/Treasurer Lisa Stefaniak, and often sent copies of her requests to Mayor Cattani, Chief Phillips, and Village Law Director/Prosecutor Michael Germano.[3]  (Brief in Opposition at pp. 3-5; Declaration of Deborah Hagedorn

---

[2]

In a separate proceeding, Defendants alleged that Ms. Hagedorn sent approximately 600 emails to Village Officials.  Ms. Hagedorn estimated that she sent approximately 400 emails.  (Docket #59-2 at p. 165.)

[3]

Mr. Germano has been an attorney licensed to practice law in Ohio since 1988.

-2-

("Hagedorn Declaration") at Paragraphs 6-22.)  The majority of Ms. Hagedorn's email related to public records, but sometimes included Ms. Hagedorn's personal opinions regarding Village officials and operations.  Ms. Hagedorn asserts that Village officials failed to timely and adequately respond to her inquiries, requiring that she send additional email regarding the status of her requests.  (Brief in Opposition at p. 4; Hagedorn Declaration at Paragraphs 14 and 16.)

Ultimately, the Village provided the information requested by Ms. Hagedorn and her subsequent review of the documentation revealed inconsistencies in Chief Phillips' time sheets and dispatch records – along with a significant increase in pay – during the time period in question.  Chief Phillips' increase in pay coincided with an increase in traffic tickets being written which generated additional revenue for the Village.  Ms. Hagedorn also became concerned with the possibility that Chief Phillips and a fellow Village Police Officer, Carrie Murray, were engaged in a sexual relationship and were collaborating to set their work schedules to coincide on nights that would generally be covered by only one patrol officer.  (Brief in Opposition at p. 6; Hagedorn Declaration at Paragraphs 29-32.)[4]

## 1. Ms. Hagedorn Requests an Investigation.

---

He was admitted to practice in the United States District Court for the Northern District of Ohio in 1993 and the Sixth Circuit Court of Appeals in 1995.  He is employed by the law firm of Wills & Richards.  In addition to serving as the Law Director and Prosecutor for the Village of Timberlake, Ohio, Mr. Germano is also the Prosecutor and an Assistant Law Director for the City of Willoughby Hills, Ohio; Prosecutor and an Assistant Law Director for the City of Kirtland, Ohio; and, Assistant Law Director for the City of Willoughby, Ohio.  (Declaration of Michael Germano ("Germano Declaration") at Paragraphs 2-3.)

[4]

Mayor Cattani admitted during deposition that he had known of the relationship between Chief Phillips and Officer Murray, but the extent of his investigation had only been to determine whether the relationship was consensual.  (Brief in Opposition at p. 6.)

-3-

Ms. Hagedorn asserts that she raised her concerns regarding the foregoing with Mayor Cattani and Clerk/Treasurer Stefaniak and that they failed to provide a satisfactory explanation. (Brief in Opposition at p. 6.)   On or about June 8, 2013, Ms. Hagedorn sent a letter to the State of Ohio Auditor's Office, on behalf of the "Concerned People of the Village of Timberlake," requesting an audit of Village finances.  "The letter questioned the fiscal management of the Village of Timberlake Police Department; accused the Village of 'overspending its budget,' and questioned the propriety of significant increases in salaries and expenses for the Timberlake Police Department."  (Brief in Opposition at p. 6; Hagedorn Declaration at Paragraphs 22-23.) Ms. Hagedorn provided copies of the information she had gathered as evidence of what she perceived to be financial irregularities and mismanagement within the Village Police Department.

Ms. Hagedorn also contacted Captain Carl Dondorfer of the Lake County Sheriff's Department who, after meeting with Ms. Hagedorn, forwarded the information she provided to the Ohio Bureau of Criminal Investigation ("Ohio BCI").  (Brief in Opposition at p. 7; Hagedorn Declaration at Paragraph 24.)  Ohio BCI opened an investigation into questionable overtime pay, scheduling and expenditures within the Village Police Department.  The investigation implicated Chief of Phillips and Officer Murray.

### 2.        Perceived Backlash.

Ms. Hagedorn states that during this time, there was a perception within the Village of Timberlake – including within the Police Department – that she was trying to "'get rid' of the Village Police Department through her actions."  (Brief in Opposition at p. 7, citing Cattani Depo. at pp. 238-39, Deposition of Geoffrey Esser ("Esser Depo.") at pp. 16-17 and 36, and Deposition of David Phillips ("Phillips Depo.") at pp. 13-14 and 26-27.)  Ms. Hagedorn states

-4-

that she, as well as another resident,[5] "faced backlash from other residents over the perceived belief that she wanted to eliminate the Timberlake Police Department."  (Brief in Opposition at p. 7.)[6]  Ms. Hagedorn also references an email sent to her by Clerk/Treasurer Stefaniak as evidence of how she was treated within the Village, in which Clerk/Treasurer Stefaniak referred to Ms. Hagedorn as a bully; stated that she was not afraid of Ms. Hagedorn; and, stated that she would continue to respect Ms. Hagedorn as a resident of the Village "despite [her] handicap." (Brief in Opposition at p. 9, citing Cattani Depo. at Exhibit 13.)

**B.     Ms. Hagedorn's July 11, 2013 Encounter With Police Officer Esser.**

During her investigation, Ms. Hagedorn states that she "had learned that police cruisers had been seen driving back and forth to the Village service garage;" that she had not seen Chief Phillips' personal car at the Village Hall where he had always parked it; and, had heard rumors that Chief Phillips was using the Service Garage to hide his personal vehicle.  (Brief in Opposition at p. 12; Hagedorn Declaration at Paragraphs 29-31.)  On June 13, 2013, Ms. Hagedorn emailed Mayor Cattani and other Village officials, including Law Director/Prosecutor

---

[5]

Village resident Deborah King, Mayor Cattani's next door neighbor who, like Ms. Hagedorn was concerned with Village finances and governance, asserts that when she attempted to discuss her concerns with the Mayor, he "interrupted" her and stated that she was "listening to the wrong people."  Ms. King states that Mayor Cattani referred to Ms. Hagedorn by name, stating she was not credible and that "she had a vendetta against all police because of her arm length long criminal record and that she frequently misinterprets the truth."  (Affidavit of Deborah King ("King Affidavit") at Paragraph 6.)

[6]

On June 23, 2013, Ms. Hagedorn's husband contacted the Timberlake Police and reported a resident he knew as "Mike," who was later identified as Village resident Mike Dragas, threatened to put "four slugs" into his chest if he got rid of the Timberlake Police Department.  Mr. Dragas denied threatening to put "four slugs" into Mr. Hagedorn, claiming that he stated only that "people could start to get shot because of the criminal element coming in the village" and "who knows it could be you that gets shot."  No charges were filed.  (Brief in Opposition at p. 8.)

-5-

Germano and Councilman Mike Stanton, regarding the matter, but received no response.

On July 11, 2013, Ms. Hagedorn decided to investigate whether Chief Phillips' car was parked inside the Service Garage.  (Brief in Opposition at p. 12; Hagedorn Declaration at Paragraphs 29-31.)  At approximately 6:35 a.m. that morning, Officer Esser encountered Ms. Hagedorn behind the City Service Garage while he was on a routine mobile patrol of the Village. (Declaration of Geoffrey Esser ("Esser Declaration") at Exhibit D.)  Officer Esser documented the incident in a Police Narrative, as follows:

> As I was about to park unit 883 near the garage, Deborah Hagedorn jumped in front of my vehicle from a weed and brush covered area behind the East side of the building/salt shed.  She was holding what appeared to be a purple phone or camera at shoulder height pointing it at me.  I immediately exited my vehicle and asked her what she was doing.  Hagedorn replied saying, I know what your [sic] doing, I know what you guys are up to, and then pulled her bicycle out from the same area she was concealing herself behind the building.  I explained that I was checking the building, that I regularly perform checks of the building, and again asked her what she was doing in that area.  Hagedorn got on her bicycle laughed, called me officer Esser, began yelling, swearing, and told me that I'm an "Asshole".  I advised her not to be disorderly and explained that if anything was taken or damaged, her presence would make her the suspect and advised her to stay out of the area.  She continued laughing and yelling as she rode away telling me that I'm an "idiot."
>
> I then checked the building, surrounding area and equipment located outside the garage.  The garage was locked and secured with no apparent signs of attempted forced entry.  The property and outdoor equipment did not appear to be damaged or tampered with.  As I was completing my check preparing to leave the area, Hagedorn rode her bicycle back into the lot from Minnewawa.  Hagedorn demanded that I open the service garage and show her what's inside.  I told her that I would not open the garage for her, that I didn't even have keys with me to be able to do so, and asked her what business does she have being at the service garage. Hagedorn responded saying she is a resident and asked me what business I have at the service garage. I explained that I work for the Village of Timberlake and told her that she does not work for the village, has no business in the service area or hiding in the weeds around the service garage.  As I began explaining that I would be generating a report about the situation and she could submit a records request if she would like, she again began laughing and yelling as she left the area.

Just as I was about to radio central dispatch and request an entry be made for a suspicious occurrence, I was contacted by them for a phone message.  I was advised that a male caller, who wished to remain anonymous, wanted a telephone call from me regarding a disturbance at the service garage area.  I was told that the caller stated a female was yelling at someone and calling them names in the service area and that the female was a local. I advised dispatch that I wanted to request a suspicious card and that Deborah Hagedorn was in that area and I was the person she had an interaction with.  Upon calling the number provided by dispatch, a male answered the phone.  I identified myself and he asked that I check the service garage area because a resident was back there yelling and swearing at someone.  I immediately recognized the voice of the caller and believe he is a Timberlake resident who lives at 35 Minnewawa.  I briefly described my interaction with Hagedorn and the male told me that was exactly the occurrence he called about. I asked the male for his name as he is a witness and he declined stating that he was afraid of dealing with repercussions and harassment from Hagedorn if she knew that he called about her. He said that he hopes his call helps the department deal with her because her behavior was a public disturbance and he doesn't think it should be tolerated.

Follow up to be made with village service employees to properly inspect the property and equipment as they have a greater level of awareness regarding current condition and may be able to identify tampering or damages that I could not.

While generating this report, Timberlake resident George Transky approached officer Foti who was on duty and identified himself as the caller who contacted dispatch requesting to speak with me.

(Docket #44-4.)

Officer Esser states that immediately following the incident, he had no intention of citing Ms. Hagedorn, but prepared the police report to memorialize what had transpired.  Later, upon learning that the complaining caller was George Transky – whose property is located very close to the Village Service Garage – Officer Esser presented information regarding the encounter to Village Prosecutor Michael Germano for review.  (Esser Declaration at Paragraphs 4-6.)  While there is evidence that Chief Phillips faxed the information provided by Officer Esser to Prosecutor Germano, there is no evidence in the record that Chief Phillips had any other involvement with the July 11, 2013 encounter between Officer Esser and Ms. Hagedorn, or with

-7-

the preparation of information for Prosecutor Germano's review.

Based on the information provided by Officer Esser, Prosecutor Germano charged Ms. Hagedorn with disorderly conduct, in violation of Section 648.04(a)(2) of the Village of Timberlake Codified Ordinances – a minor misdemeanor.  *Village of Timberlake v. Hagedorn*, Willoughby Municipal Court Case No. 13-CRB-2427.  Section 648.04(a)(2) provides, in part:

> (a)  No person shall recklessly cause inconvenience, annoyance or alarm to another, by doing any of the following:
>
>             * * *
>
> (2)  Making unreasonable noise or an offensively coarse utterance, gesture or display, or communicating unwarranted and grossly abuse language to any person.

Prosecutor Germano states in his Affidavit that the decision was made to proceed to trial based upon the separate complaint of Mr. Transky, not upon the recitation of events set forth in Officer Esser's Police Narrative, and states that Chief Phillips did not encourage or attempt to influence his decision to pursue the disorderly conduct charge.  (Germano Declaration at Paragraphs 5-6.)  A citation was prepared and served upon Ms. Hagedorn 3 days later.

Ms. Hagedorn asserts that even though Chief Phillips denied any involvement in the filing of the disorderly conduct charge against her, the prosecution was retaliatory and motivated by a desire to silence Ms. Hagedorn.  Ms. Hagedorn cites a text message from Chief Phillips to Mayor Cattani, in which Chief Phillips referred to an unrelated arrest of two individuals and stated "just needed the Hag and things could not have been more perfect," as well as statements Chief Phillips made to BCI regarding Ms. Hagedorn, which are discussed more fully below, as evidence that the disorderly conduct charge was filed against her in retaliation for her efforts to uncover wrongdoing within the Police Department.  (Brief in Opposition at p. 9; Cattani Depo. at

pp. 105-06.)

**Bench Trial – Disorderly Conduct Charge**.

On October 16, 2013, a bench trial was held before Willoughby Municipal Court Magistrate Judge Almis J. Stempuzis regarding the disorderly conduct charge.  (Docket #18 at Exhibit 1, Trial Transcript.)  Ms. Hagedorn testified that she was behind the Service Garage early on July 11, 2013, checking the area and "expecting to witness further misconduct by the Timberlake Police Department" and that when Officer Esser arrived he startled her and she concluded that he had followed her.  (Id. at p. 61.)  She testified that she "took her camera out because of the harassment [she had] been receiving from the TPD" and that she had been advised by the Lake County Sheriff's Department to take a picture "when harassment happened."  (Id.)  Ms. Hagedorn testified she assumed Officer Esser was behind the Service Garage to harass her "because she ha[d] been getting an inordinate amount of harassment and intimidation;" that she took pictures because she was afraid and being harassed; and that she was "ready for the Timberlake Police."  (Id. at p. 79.)  Ms. Hagedorn believed she had been "shown animosity" ever since she made public records requests.  (Id. at p. 90.)

Ms. Hagedorn testified that when Officer Esser told her he would have to give her a disorderly conduct ticket, she "laughed because [she] thought it was a tactic of intimidation." (Id. at p. 62.)  Ms. Hagedorn related that Officer Esser told her, "since you're back here, if anything's missing, you're going to be the first person we look for" and testified that since she was wearing tight clothing that could not conceal anything, she laughed and responded "pat me down" and "you're an asshole."  (Id. at pp. 62-63.)  Ms. Hagedorn testified that she was not concerned when Officer Esser told her he would me making a report, because she didn't think that as a Village resident she was prohibited from being there and hadn't done anything illegal.

-9-

(Id. at p. 63.)  Ms. Hagedorn was unaware anyone could hear her or had heard her exchange with Officer Esser that morning.

During trial, Officer Esser testified to the facts as set forth in his Police Narrative.  Mr. Transky testified that he was in his daughter's bedroom when he heard "inappropriately" loud voices outside and could hear the male voice state "make a public records request" and the female voice state "maybe I will, you asshole."  (Id. at pp. 42-44.)  Mr. Transky testified that he called the police because he was both curious and aggravated because of the "highly discourteous level of tone of voice, projected voice" and that "there was nothing justifiable about the level of sound" that he heard.  (Id. at pp. 46 and 57.)

Although the Magistrate Judge noted probable cause existed to support the disorderly conduct charge, he found Ms. Hagedorn not guilty, reasoning that when Ms. Hagedorn called Officer Esser an asshole, she was engaging in protected speech.  (Id. at pp. 92-94.)  Nevertheless, the Magistrate Judge admonished Ms. Hagedorn for her behavior and stated that Ms. Hagedorn had "no credibility."  (Id. at p. 92.)  The Magistrate noted that he found Officer Esser's "testimony to be extremely competent, extremely credible" and found him to be "100 percent truthful."  (Id.)

### C.      Ohio BCI – Investigation of Misconduct.

As a result of the information gathered by Ms. Hagedorn with regard to improprieties within the Village Police Department, Special Agent Momchilov of Ohio BCI conducted an investigation.  During that time, Chief Phillips contacted Special Agent Rick Warner of Ohio BCI in reference to email he received from Ms. Hagedorn.[7]  (Brief in Opposition, Exhibit 1-L.)

---

[7]      On July 21, 2013, Chief Phillips filed a Police Report with the Village Police

-10-

Special Agent Warner referred Chief Phillips to Special Agent Momchilov.  (Id.)

Special Agent Momchilov interviewed Mayor Cattani; Chief Phillips; and, Officer Esser regarding the allegations of misconduct raised by Ms. Hagedorn.   (Brief in Opposition, Exhibits 1-L, 1-M and 1-N.)  When interviewed, Chief Phillips referred to Ms. Hagedorn as a "problem resident who [had] requested a large amount of public records in an attempt to get Chief Phillips fired."  (Brief in Opposition, Exhibit 1-L.)  Chief Phillips explained that he was hoping BCI could review the email he received from Ms. Hagedorn and possibly obtain charges against Ms.

---

Department regarding email sent to him by Ms. Hagedorn, stating as follows:

> On July 21st, 2013, did I [sic] check my personal E-mail Account around 0750 hrs. and found 4 E-mails from Deborah Hagedorn in my Spam File.  I then proceeded to open and read each E-mail and in the process of opening the email titled "You are going down", I did feel threatened for my life along with the lives and safety of my Officers, Council Members, and General Public who are known to support me. I then proceeded to forward the E-mails to the Mayor and Village Prosecutor for review.
>
> I then spoke with the Mayor and advised him that it was necessary to put a standing order for special attention on the Hagedorn's residence. This was due to the content of the E-mails which clearly implies that Deborah Hagedorn, along with Steve Hagedorn, will be armed and they will forcefully engage any police officer, council member, or supporter that happens to come near to, or on to their property. I explained to the Mayor that Hagedom's past behavior, including an assault on a Lakewood Police Officer and threats made against Timberlake officer Corp. Faunce during an arrest for disorderly conduct while intoxicated (TPD repmi #2009-138) where she stated that if she had a gun she would blow his brains out, accompanied by her more recent behavior including an email stating that her and Steve purchased a hand gun for their protection, an email stating·that any animals that trespass onto their property will disappear, a villagers cat being shot in the head shortly after the email was sent and her latest encounter with Officer Esser where she jumped  out of weeds at the service garage and confronted him at 0630 in the morning have raised concerns that there is an element of instability that has caused a real fear for every officers and villagers lives, especially mine, Officer Murray's and our families, and that there is a presence of immediate danger.
>
> Attached to this report are documents specifically outlined above in addition to a comprehensive collection of documents supporting and demonstrating the pattern of contact with the villages officials and departments as well as individual residents.

(Docket #49-4 at pp. 22-23.)

Hagedorn, which Prosecutor Germano had declined to do, and also wanted to "explore other options such as tax evasion."  (Id.)

On October 17, 2013, Chief of Police Phillips and Officer Murray were suspended from the Police Department pending the completion of the State's investigation.  Officer Esser served as Acting Chief of Police and was later appointed as Chief of Police permanently.

In mid-April 2014, Mr. Phillips was indicted by the Lake County Grand Jury on two counts of theft in office and two counts of tampering with records.  Ms. Murray was indicted by the Lake County Grand Jury on two counts of theft in office.  In August 2014, Mr. Phillips entered a guilty plea to the charges against him and was sentenced on October 6, 2014.  Ms. Murray entered a plea of guilty to a reduced charge and was also sentenced on October 6, 2014.

> **D.**     **Ms. Hagedorn's Concerns Regarding Mayor Cattani and Clerk/Treasurer Stefaniak.**

Ms. Hagedorn asserts that the additional information she received from Ohio BCI as a result of the investigation – as well as the outcome of the criminal cases filed against Chief Phillips and Ms. Murray – "only served to raise more serious concerns about Cattani and Stefaniak's management of the Village's police department and financial affairs."  (Brief in Opposition at p. 11.)  Ms. Hagedorn believed that Mayor Cattani and Clerk/Treasurer Stefaniak had engaged in misfeasance and malfeasance and she repeatedly called for both to resign.  (Id.; Hagedorn Declaration at Paragraphs 43-44.)  She and others "created and posted signs in their yards and on their personal vehicles highly critical of Cattani and Stefaniak."  (Brief in Opposition at p. 11; Hagedorn Declaration at Paragraphs 45-49.)  Ms. Hagedorn began investigating ways to have them removed from office and emailed Prosecutor Germano on July 20, 2014 to ask "what options there were for residents to pursue their removal."  (Brief in

-12-

Opposition at p. 11.)  Her email was forwarded to Mayor Cattani, who then forwarded the email to Clerk/Treasurer Stefaniak and other members of Village Council.  (Id.; Hagedorn Declaration at Paragraph 36.)

### E.    Email and Interaction Between Ms. Hagedorn, Mayor Cattani and Mayor Cattani's Family.

As stated above, Ms. Hagedorn sent numerous public records requests, via email, to Village Clerk Treasurer Lisa Stefaniak and Mayor Cattani, among others, requesting information regarding Village finances and administration.  In addition to her public records requests, some of Ms. Hagedorn's email included her personal opinions regarding Village operations and officials, and others were directed to Mayor Cattani and his family, admonishing them for various things.  During this same time, Ms. Hagedorn and several other Village residents were very vocal regarding their desire to have Mayor Cattani and Clerk/Treasurer Stefaniak removed from office and had posted signs in their yards and on their cars expressing the same.[8]

Prior to October 2013, Ms. Hagedorn contacted Mayor Cattani through his personal email address, dcatt99@hotmail.com, which until then he had used for both personal and Village business.  In October 2013, Mayor Cattani decided to use his Village email address, dcattani@villageoftimberlake.com, rather than his personal email account, for all Village business.  On October 30, 2014, Mayor Cattani notified Ms. Hagedorn, via email, that she should use his official Village email address for all email correspondence going forward.

### 1.    November 4, 2014 Incident Report.

On November 4, 2014, an Incident Report was completed by Village Police Officer

---

[8]      The signs included a picture of Mayor Cattani appearing to be asleep, with a caption stating that he was "asleep on the job."  (Brief in Opposition at p. 16.)

Marks, Report No. 14-CR049, regarding a Complaint made by Mayor Cattani.  The Report reads

as follows:

> On 11/04/14 at 1425 Hrs., while on patrol of the Village of Timberlake, East
> Shore Blvd., I was motioned over by Mayor Dave Cattani.  Mayor Cattani
> requested a report be made concerning a menacing by stalking from Deborah
> Hagedorn.  Hagedorn has been repeatedly harassing Mayor Cattani demanding
> that he resign.  Hagedorn has been making statements that she is going to get a
> recall on the mayor.
>
> This week Hagedorn has had signs in her yard demanding the recall of Mayor
> Cattani and Clerk-Treasurer Lisa Stefaniak.  Several of these signs have been
> placed in yards throughout the village.  Included in the placement of the yard
> signs is Cattani's next door neighbor, Deborah King at 43 East Shore.
>
> On this date, Hagedorn and King were observed with magnetic signs on the side
> of their vehicles with a picture of the mayor and the statement of him being asleep
> on his job.
>
> King's vehicle was parked in the driveway between her residence and the Cattani
> residence. Mayor Cattani stated that his wife and children could see the sign and
> were alarmed and frightened.
>
> Just prior to my contact, Mayor Cattani was outside in his front yard talking with
> Bob Jacobs. Hagedorn drove by three times with the magnetic sign visible to the
> mayor.  On the third time Hagedorn blew the horn of her vehicle to get the
> attention of Cattani and Jacobs.
>
> Mayor Cattani stated that he feels harassed and intimidated by Hagedorn.  His
> family is upset.
>
> Mayor Cattani and Bob Jacobs both made written statements concerning the
> incident.  Mayor Cattani was advised that the report would be forwarded to the
> village prosecutor for determination of possible charges.

(Docket #49-4 at p. 25.)  At that same time, Mayor Cattani submitted a handwritten Voluntary

Statement, explaining as follows:

> I was raking leaves in my front yard and Deborah Hagedorn drove by 3 times in 5
> minutes.  She honked at me on the third pass, as I stood in the driveway talking
> [with] Bob Jacobs of Napahwin.
>
> I feel harassed and intimidated.  My family is upset and I have no answers for

-14-

them.  I want the harassment to stop.

(Docket #49-4 at p. 26.)

No charges were filed by Prosecutor Germano as a result of the November 4, 2014 Incident Report and Statement.  Ms. Hagedorn asserts that the Police Report and Statement prove that Mayor Cattani wanted to silence her and retaliate against her for her efforts to have him removed from office.  (Brief in Opposition at p. 17.)

Later on November 4, 2014, at 10:52 p.m., Ms. Hagedorn sent the following email to Mayor Cattani, at his Village email address, copying numerous others, stating as follows:

Mayor Cattani,

It has come to my attention that your mother, Mrs. Rini Cattani, stole a piece of my property (sign) from Ms. Helen Nevik's yard after having a confrontation with Myra Nevik's [sic] early this morning.  Ms. Myra Nevik empathically refused to concede to Mrs. Cattani's demands to remove said sign, which subsequently resulted in your mother's theft of said sign immediately after Ms. Nevik left for work.

We are also aware that your mother, Ms. Rini Cattani, confronted Mrs. Carole Dow, infringing on her Constitutional Rights of Freedom of Speech, early this morning, begging her to remove signage with your name.  In this case, Mrs. Dow conceded after your mother guilted her with stories of having "cancer," and tearfully begged on your behalf.

As unfortunate as these circumstances are, the fact remains, your mother did not have the right to remove any signs from private property, thus, belonging to me, which I am certain she was aware.

I telephoned your parents this evening, asking for the return of my property, at which time your father, Joe, denied any involvement on behalf of your mother, Mrs. Rini Cattani.

Obviously, this is an embarrassing situation for you and your parents in the absence of self-control, and I truly do not wish to proceed further.

However, in view of the seriousness of the litigation previously proposed for your removal, as well as the clerk treasurer for misfeasance, gross misconduct, and your lack of acknowledgement therewith, must advise, based on my attorney's

-15-

recommendations, we will be filing a police report for stolen property with the Timberlake Police Department if said property is not returned within 24 hours.

Respectfully,
Mrs. Deborah Hagedorn

(Docket #44-10.)  It was subsequently determined that Mayor Cattani's mother did not steal the yard sign from Ms. Nevik's yard as was alleged by Ms. Hagedorn in her email.  (Hagedorn Depo. at pp. 70-82.)

### 2.      Email from Ms. Hagedorn to Mayor Cattani's Wife.

On November 17, 2014, at 11:02 p.m., Ms. Hagedorn sent an email to Mayor Cattani's wife at her personal email address, copying Mayor Cattani using his personal email address.  The email reads as follows:

I can't wait to meet the minister of your church!  Because of you, our signs will be put out again in full force and it's up to you to finally become a responsible parent and educate your children as to the values, principles and importance of honesty vs. being a hypocrite and nurturing dysfunctional children which you have already demonstrated you are very good at.

I don't care if you are the Mayor's wife or the mayor's mother, none of you have any business speaking on behalf of all the residents of this village.  Once the facts are revealed, we expect and hope you will move out of the village as fast as you can.

You have ignored the safety of your children repeatedly, and it is a wonder they have not been seriously harmed. It is a proven fact you and Dave have violated at least five laws in the village and put your son in danger.  It is a bit late to blame our signs for the dysfunction that exists in your family,

Everyone has talked about your inadequacy as a mother in view of your lack of oversight.  That seems to be something you and your husband have in common, but it won't last much longer.

Again, shame on Sunny for being intimidated by the Cattani's as Joe and Rini's neighbors were forced to suffer Rini's rant and raves against you their "FREEDOM OF SPEECH ." Next time they will not be so sympathetic in view of your "retaliation." And Your propaganda,

-16-

The thing is Julie, every time your husband, the Mayor, acts out of fear....his friend Batoki begging residents to let Dave finish out his term, etc., etc., the signs, the lies,....it is All working in our favor. We love it, but pay for your own advertisement in the Times or the next thing is going to have to happen is a law suit for wasting tax payers money,.[sic]  You don't speak for the majority, it is an abuse of power for the Mayor to allow this to occur.

Regards,
Deborah Hagedorn

(Docket #44-11 at p. 2.)

Ms. Hagedorn's reference to "the Times" relates to a "courtesy note" published in the Village newspaper, written by Mayor Cattani's wife, regarding the impact that the signs and letters posted and mailed by Ms. Hagedorn and several others had on the families of Village Mayor, Council and Clerk.  Ms. Hagedorn and others objected to Mayor Cattani's wife being permitted to publish the "note" in the Times, arguing it did not fall within the applicable guidelines.[9]

On November 18, 2014, at 12:13 a.m., Ms. Hagedorn emailed Mayor Cattani, at his Village email address, stating as follows:

This is another ridiculous example of bias in publishing a "COMMUNITY PAID PAPER," with personal opinions and agendas being printed in violation of a passed RESOLUTION" outlining allowable content.

It is offensive to expect all residents to pay for a paper that serves a few select residents.  This has clearly become a paper published with personal opinions of Joe Cattani, Dave and Julie, etc[.] You need to reimburse the village for violations of Passed Resolution which as Mayor, you continue to abuse the laws for self suiting purposes rather than serve the village as a whole.

Julie, you certainly lack credibility since you and your husband encouraged your own signs after ours were removed.  We certainly appreciate the continued

---

[9]

In an email dated November 17, 2014, Village resident Diane Nicholes had also emailed Mayor Cattani at his personal email address to voice her complaints regarding the "note" published in the Village Times.

-17-

demonstration of a double standard prevalent in the village.

It's up to you, your husband, parents, etc to educate your children regarding the message our signs are designed to deliver in support of imminent court action. The signs will be going back up because of your attempt to discredit and bully, same as mother Rini.

You've done nothing but destroy this village, your children are reaping what you sowed as irresponsible residents, adults and paid public official.

No mercy, you brought this on and we will prove it.

(Docket #46-1 at p. 63.)

On November 18, 2014, at 9:10 p.m., Mayor Cattani responded to Ms. Hagedorn's

November 17, 2014 email to his wife, from his personal email account, stating as follows:

Hagedorn;

My entire family never needs to read or hear your hateful words again.
Leave me alone.
Leave my wife alone.
Leave my children alone.
Leave my parents alone.

Do not email any of us at our personal accounts.
Do not telephone any of us.
Do not send any mail to our homes.
Do not come to our homes.
Do not wave to us on the street.
Do not scream at my children.
Do not honk at me or my family.
Do not follow us.
Do not slander us.

Dave, Julie, Joe, Rene, Jack and Ella Cattani
Residents

(Docket 44-11 at p. 1.)  In addition, that same evening, Mayor Cattani sent an email to Ms.

Hagedorn from his Village email address, blind copying Chief Esser and Village Prosecutor

Germano, advising as follows:

-18-

> Ms. Hagedorn,
> You were told on Oct 30, 2014 how to contact the mayor.
> You apparently have a hard time following directions, so let me help you:
> If you need to reach the mayor in writing, you will send it to my village mailbox at 11 E. Shore Blvd, or by email at dcattani@villageoftimberlake.com.
> Do not contact the mayor by phone for any reason.  You can communicate anything you need to relay verbally through our Solicitor or through the Police Department.
> Mayor Cattani.

(Docket #44-6 at p. 3.)

On November 19, 2014, at 2:26 a.m., Ms. Hagedorn emailed Mayor Cattani, at his personal email address, stating as follows:

> Junior Cattani, Please consider these instructions mutually effective to pertain to yourself, your wife, your mother, your father and members of council and the Timberlake police department who carry out your directives. I don't appreciate being threatened by you or your Chief of Police, Geoff Esser, so remember, while you have the TPD standing by your side when you break the laws, we still have the Lake County Sheriff's Office that will ensure our safety as well as prosecute criminal activity that you endorse.

(Docket #44-11 at p. 1.)

On Monday, December 15, 2014, at 1:13 a.m., Ms. Hagedorn sent another email to Mr. Cattani, at is personal email address, stating as follows:

> there is something I have been meaning to tell you

> Go Fuck yourself.

(Docket #44-11 at p. 1.)  That same morning, at 9:49, a.m., Mayor Cattani responded, stating "Hagedorn; As I told you before, please do not contact me at my personal email.  I have no time for your childish nonsense.  Dave Cattani."  (Docket #44-6 at p. 5.)

Between October 31, 2014 and January 6, 2015, Mayor Cattani received 15 separate emails from Ms. Hagedorn, addressed to his personal email account.   Mayor Cattani filed a Statement and Complaint with the Police Department, which reads as follows:

-19-

I am the owner of personal email account dcatt99@hotmail.com. Established in 1999, this account has also been used to receive mail relative to my duties as councilperson and mayor since I first took office on 1/1/06. Typically, nearly all village correspondence involves internal emails or communications from other governmental offices. As mayor, only a very small minority of the mail volume has been generated by residents. In glaring contrast to the above pattern since 7/28/12, I have received approximately 500 emails from Deborah Hagedorn, 58 E Shore Blvd., at this personal account, sent from several accounts, including hagedornd@ymail.com, hagedornd@me.com, and hagedornd@icloud.com.

While all village officials have email accounts on the villageoftimberlake.com domain, incoming mail is forwarded to our personal accounts for ease of access. Unfortunately, any response to inbound mail has borne the address of the personal account, as our unsophisticated infrastructure was unable to function otherwise. On 10/29/14 I received 5 separate emails from Ms. Hagedorn, as well as an email from her on 10/30/14. In an effort to separate my village emails from my personal emails and personal life, I was driven to successfully configure a separate account (dcatt99@gmail.com) for use in my capacity as mayor. This account receives forwarded mail from the village account, and is able to generate outbound email bearing the proper village domain rather than my personal account information. After confirming the functionality of the new account configuration, on 10/30/14 I advised Ms. Hagedorn that effective immediately, I would no longer be reading or responding to her emails sent to my personal account. This email was sent from the village account. She was instructed to send ALL village communications to my village email account: dcattani@villageoftimberlake.com. I have also sent notice to all official contacts to discontinue use of the personal account, and I have very consistently conducted village business in the village account since that date. My personal account is now segregated for my for personal use.

On 10/30/14, within 2 hours of my instructions to use the village account, Ms. Hagedorn successfully complied with those instructions, responding to the village account. However, later on 10/30/14, Ms. Hagedorn wrote to my personal account, making reference to comments I had made in the 10/30/14 note. Between 10/30/14 and 11/16/14 I received 8 new emails from Ms. Hagedorn at my personal account. During this time period, Ms. Hagedorn contacted my parents by telephone, accusing my mother of stealing her yard sign and intimidating neighbors regarding display of yard signs. She also gained awareness of my wife's email account, and sent her a hate-filled note on 11/17/14, copying me on the email at my village account.

After seeing the vicious content of the attack on my wife, I could no longer tolerate Ms. Hagedorn's personal attacks. On 11/18/14 I advised Ms. Hagedorn that she was never to contact me or my family - including my parents, children, and wife - in person, by mail, by email, by phone, or by various non-verbal

-20-

means.  In an effort to ensure that Ms. Hagedorn had access to me in my capacity as Mayor, on 11/18/14 I simultaneously sent a separate email from my village account, advising Ms. Hagedorn that she was to use only my village account to reach the Mayor.  Ms. Hagedorn again ignored my instructions, and acknowledged and responded to my personal email account on 11/19/14.

On 6 occasions between 11/22/14 and 12/15/14 Ms. Hagedorn again contacted me at my personal account.  Ms. Hagedorn's 12/15/14 note, which was particularly offensive, was a direct reply to my 11/18/14 note, containing the full text of my instructions warning her not to contact me at my personal account.  On 12/15/14 I again advised Ms. Hagedorn not to contact me at my personal account.  Most recently, Ms. Hagedorn sent an email to both my village and personal accounts on 1/6/15, again ignoring my  notices  of  10/30/14,11/18/14,12/15/14.

Since 10/30/14, Ms. Hagedorn has sent numerous emails to my village account, demonstrating her awareness of the account's existence, her ability to use the account, and her awareness that this was the appropriate channel to reach the Mayor.  In spite of her demonstrated awareness of my instructions, and her documented ability to follow the instructions, she continues to harass me personally.  I am at a loss on how to deal with this woman. She seems determined to degrade my quality of my personal life as well as destroy my reputation as mayor.  Ms. Hagedorn has shouted at my wife and child on past occasions, and threatened to have her dogs attack my children.  My family is fearful of their physical safety due to her long history of unreasonable and aggressive behavior.  Given my own awareness of her long history involving charges of assault, numerous instances of disorderly conduct, telecommunications harassment, improper use of 911 systems, and resisting arrest, I have legitimate concerns for my family's physical welfare as well as our emotional health.  It's the right of any resident to interact with government officials regarding their performance in office.  However, over the past two years, Ms. Hagedorn has repeatedly demonstrated a frightening obsession with me, as well as a personal animus towards me and my family.  I have persistently advised her to not contact me at my personal account since October, 2014.  I want her harassment to stop, and I ask that the criminal courts assist me in this simple goal.  I will not suffer another year of her dangerous and irrational behavior.

Attached to this statement are 36 of the aforementioned emails (totaling 62 single-sided pages and individually identified below), which I have printed from my personal computer in my home, generating the printouts directly from my Hotmail and Gmail accounts.  I have hand-carried this same evidence from my home the police station and delivered it to the Officer on Duty, Officer Hutchinson.  I have also scanned said documents, generating a .pdf file, which is available upon request for the same purpose.

(Docket #46-1 at pp. 20-21.)

Subsequently, between January 14, 2015 and February 13, 2015, Mayor Cattani received 6 emails from Ms. Hagedorn, addressed to his personal email account.  Between May 24, 2015 and May 27, 2015, Mayor Cattani received 3 emails from Ms. Hagedorn, addressed to his personal email account.  Between June 29, 2015 and July 1, 2015, Mayor Cattani received 2 emails from Ms. Hagedorn, addressed to his personal email account.

### F. Telecommunications Harassment Charges Against Ms. Hagedorn / Residents' Petition for Removal Against Cattani and Stefaniak.

On January 27, 2015, Prosecutor Germano charged Ms. Hagedorn with telecommunications harassment under Ohio Rev. Code § 2917.21(A)(5).  *State of Ohio v. Deborah Hagedorn*, Willoughby Municipal Court, Case No. 15-CRB-310.   During his deposition, Prosecutor Germano testified he that he reviewed the evidence, conducted legal research, and concluded that there was probable cause to charge Ms. Hagedorn with telecommunications harassment based on the fact that Ms. Hagedorn continued to send emails to Mayor Cattani's personal email address after he explicitly told her to stop.  (Germano Depo. at pp. 11-14.)   Willoughby Municipal Court Magistrate Judge Almis J. Stempuzis found probable cause to issue a warrant for her arrest.  (Docket #s 43-3 and 43-4.)  Ms. Hagedorn alleges this was a false charge, sought by Mayor Cattani and Police Chief Geoffrey Esser without probable cause, in retaliation for the exercise of her right to free speech.  Ms. Hagedorn asserts that Mayor Cattani "wanted Ms. Hagedorn silenced because of her continual very public criticism of him" and "very public efforts to have him removed from office."  (Brief in Opposition at p. 16.)

On February 2, 2015, Village of Timberlake Residents Deborah King, Diane Nicholes, and Peter Hahn, along with Ms. Hagedorn and her husband ("Petitioners"),

filed a Complaint with the Lake County, Ohio Probate Court pursuant to Ohio Rev. Code § 733.72, seeking to have Mayor Cattani and Clerk/Treasurer Lisa Stefaniak removed from office.  *King v. Cattani*, Lake County Probate Court, Case No. 15 CV 15.  (Docket #49-5.)  Petitioners asserted that Village officials were not acting in the best interests of Village residents and listed 49 "separate matters" in which they believe Mayor Cattani and/or Clerk/Treasurer Stefaniak acted contrary to law in performing their duties.

On March 18, 2015, an additional charge of telecommunications harassment under Ohio Rev. Code § 2917.21(A)(5) was filed against Ms. Hagedorn by Prosecutor Germano, stemming from email directed to Mayor Cattani's personal email address. *State of Ohio v. Deborah Hagedorn*, Willoughby Municipal Court Case No. 15-CRB-850. A probable cause hearing was held on March 18, 2015 and Willoughby Municipal Court Judge Harry Field found probable cause to issue a warrant.  (Docket #43-5.)  Ms. Hagedorn alleges this was a false charge, sought by Mayor Cattani and Police Chief Geoffrey Esser without probable cause, in retaliation for the exercise of her right to free speech.

On or about March 30, 2015, Petitioners seeking the removal of Mayor Cattani and Clerk/Treasurer Stefaniak from office agreed to dismiss their Petition for Removal, with prejudice, in consideration for both Mayor Cattani and Clerk/Treasurer Stefaniak's agreement not to run for election or re-election in the Village of Timberlake and agreement not to apply for or accept an appointed position within the Village of Timberlake.  (Docket #18-12.)   Prosecutor Germano states in his Declaration that one of the conditions demanded by Petitioners was the dismissal of the telecommunications harassment charges pending against Ms. Hagedorn – Case Nos. 15-CRB-310 and 15-

-23-

CRB-850.  Mr. Germano states that he "reluctantly agreed to move for dismissal of the two cases."  (Germano Declaration at Paragraph 11.)  On April 8, 2015, the criminal charges filed against Deborah Hagedorn in Case Nos. 15-CRB-310 and 15-CRB-850 were dismissed.  (Id. at Paragraph 12.)

Subsequently, on July 2, 2015, additional charges of telecommunications harassment under Ohio Rev. Code § 2917.21(A)(5) were filed by Prosecutor Germano against Ms. Hagedorn, stemming from five emails she sent to Mayor Cattani's personal email address on May 24, 2015, May 26, 2015, May 27, 2015, June 29, 2015 and July 1, 2015.  *State of Ohio v. Deborah Hagedorn*, Willoughby Municipal Court, Case Nos. 15-CRB-2286 and 15-CRB-2575.   (Amended Complaint at Paragraphs 50 and 51.)  In each case, Willoughby Municipal Court Judge Harry Field found probable cause to issue a warrant.  (Germano Declaration at Paragraph 13.)

A Jury Trial was held on January 8, 2016 in the Willoughby Municipal Court. Ms. Hagedorn was found not guilty of knowingly emailing Mayor Cattani at his personal email address after being instructed to use only his Village email address.  During trial, Ms. Hagedorn acknowledged that she sent over 400 emails to Mayor Cattani, but testified that certain emails were sent to Mayor Cattani's personal email account by accident and that she never sent anything to Mayor Cattani for the purpose of harassment.  (Docket #59-2 at p. 165.)

During trial, Mayor Cattani testified that he was not trying to silence Ms. Hagedorn by asking her to direct email to his Village account; that he viewed some of what she emailed as a personal "attack;" and, that he wanted to "create a wall" between his official and personal communications.  (Docket #59-2 at pp. 67 and 78.)  Mayor

-24-

Cattani also testified that he "tried to distance himself as much as possible from Ms.

Hagedorn" and that he "was not out to get anybody."  (Id at p. 91.)

**II.      Procedural Background.**

Ms. Hagedorn filed this lawsuit on July 10, 2015 and filed an Amended Complaint

on January 21, 2016.  Ms. Hagedorn alleges that Defendants in this case unlawfully

pursued criminal charges against her on 5 separate occasions without probable cause, in

retaliation for her exercising her First Amendment right to free speech.  Plaintiff alleges

violations of both Federal and State law.

On May 27, 2016, Defendants filed their Motions for Summary Judgment.

(Docket #s 43 and 44.)   On July 8, 2016, Ms. Hagedorn filed her Brief in Opposition.

(Docket #54.)  On August 1, 2016, Defendants filed their Reply Brief.  (Docket #59.)

Ms. Hagedorn filed a "Supplemental Brief in Opposition" on August 15, 2016 (Docket

#63) and Defendants filed a "Supplement" on August 23, 2016.  (Docket #64.)

**III.     Summary Judgment Standard.**

Summary judgment is appropriate when the court is satisfied "that there is no

genuine dispute as to any material fact and that the moving party is entitled to a judgment

as a matter of law."  FED. R. CIV. P. 56(c).  The burden of showing the absence of any

such "genuine dispute" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility
> of informing the district court of the basis for its motion, and identifying
> those portions of 'the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with affidavits, if any,' which it believes
> demonstrates the absence of a genuine [dispute] of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  As a general

matter, the district judge considering a motion for summary judgment is to examine

-25-

"[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Id.*  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249.  Determination of whether a dispute is "genuine" requires consideration of the applicable evidentiary standards.  The court will view the summary judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual [disputes] that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.

The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury."  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. Ky. 1995).  FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate.  *Id.*

**IV.    Discussion.**

The Court has thoroughly and exhaustively reviewed the claims raised by Ms.

-26-

Hagedorn; Defendants' Motions for Summary Judgment and the briefing responsive thereto; and, all supporting documentation, including a detailed analysis of the deposition testimony and evidentiary materials submitted by both Parties.

> **A.     State Law Claims - Fourth, Fifth, Sixth, Ninth, and Tenth Claims for Relief.**

In her Fourth, Fifth, Sixth, Ninth and Tenth Claims for Relief, Ms. Hagedorn alleges Defendants filed criminal charges against her on five separate occasions, without probable cause and in retaliation for speaking out on matters of public concern, in violation of her rights under Article 1, Section 11 of the Ohio Constitution.  Article I, Section 11 of the Ohio Constitution provides as follows:

> § 11 Freedom of speech and of the press; libel.
>
> Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. In all criminal prosecutions for libel, the truth may be given in evidence to the jury, and if it shall appear to the jury, that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted.

Article I, Section 11 of the Ohio Constitution does not create a private cause of action for the rights enumerated therein.  *See Webster v. Lucas Cnty. Bd. of Elections*, No. 3:07 CV 3687, 2008 U.S. Dist. LEXIS 55609 (N.D. Ohio July 22, 2008) (citing *Burr v. Burns*, 2005 U.S. Dist. LEXIS 39188 (S.D. Ohio Aug. 12, 2005) (citing *Provens v. Stark County Bd. of Mental Retardation and Developmental Disabilities*, 64 Ohio St. 3d 252 ("[t]he constitutional provision does not set forth an accompanying cause of action for a violation of the right of free speech")); see also, *PDU, Inc., v. City of Cleveland*, 2003 Ohio 3671, *12 (Ohio Ct. App. Cuyahoga County 2003) ("unlike the federal system where 42 U.S.C. § 1983 creates a private cause of action, there exists no statute in Ohio analogous to Section 1983")).

-27-

Based on the foregoing, Defendants are entitled to summary judgment as to Ms.

Hagedorn's Fourth, Fifth, Sixth, Ninth, and Tenth Claims for Relief as a matter of law.

> **B.      Federal Claims - First, Second, Third, Seventh, and Eighth Claims for Relief.**

Ms. Hagedorn's Federal claims, brought pursuant to 42 U.S.C. § 1983, mirror her State

law claims, alleging Defendants filed criminal charges against her on five separate occasions,

without probable cause and in retaliation for speaking out on matters of public concern, in

violation of her rights under the First Amendment of the United States Constitution.  In order to

recover under Section 1983, a plaintiff must prove: (1) that she was deprived of a right secured

by the Constitution or laws of the United States; and (2) that the deprivation was caused by a

person acting under color of state law. *Marcilis v. Twp. of Redford*, 693 F.3d 589, 595 (6th Cir.

Mich. 2012). "[A]cting under color of state law requires that the defendant in a § 1983 action

have exercised power possessed by virtue of state law and made possible only because the

wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988)

(internal quotation marks omitted).

A retaliation claim under 42 U.S.C. § 1983 requires proof that "(1) the plaintiff engaged

in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a

person of ordinary firmness from continuing to engage in that conduct; and (3) . . . the adverse

action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*,

175 F.3d 378, 394 (6th Cir. Mich. 1999) (en banc).  A plaintiff in a retaliatory prosecution action

must plead and show that the defendant lacked probable cause to press the underlying criminal

charges.  *Bickerstaff v. Lucarelli,* 830 F.3d 388 (6th Cir. Ohio 2016) (citing *Hartman v. Moore*,

547 U.S. 250, 265-66 (2006) (noting that "[b]ecause showing an absence of probable cause will

have high probative force, . . . it makes sense to require such a showing as an element of a

plaintiff's case"); see also *Barnes v. Wright*, 449 F.3d 709, 720 (6th Cir. Ky. 2006) (concluding that, because "the defendants had probable cause to seek an indictment," the plaintiff's First Amendment retaliation claim failed)). "[P]robable cause to initiate a criminal prosecution exists where 'facts and circumstances are sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged.'" *Webb v. United States*, 789 F.3d 647, 666 (6th Cir. Ohio 2015) (quoting *MacDermid v. Discover Fin. Servs.*, 342 F. App'x 138, 146 (6th Cir. Tenn. 2009) (modification omitted)).

While there is no doubt that there was a great deal of tension and discord between Ms. Hagedorn and Village officials during the time period in question, there is no evidence in the record whatsoever that any of the named Defendants attempted to silence Ms. Hagedorn, interfere with her right to free speech, or that the criminal charges filed against her were in retaliation for speaking out regarding matters of public concern in the Village. Ms. Hagedorn continued to exercise her right to free speech in a myriad of ways – both before and after she was charged by the Village Prosecutor – without interference. As set forth more fully below, each of the criminal charges brought against Ms. Hagedorn by the Village Prosecutor were supported by probable cause and there is no evidence that the Village Prosecutor's decision to press charges was the result of improper influence or a retaliatory motive. Thus, Defendants are entitled to summary judgment as a matter of law.

### 1.    Disorderly Conduct.

In her First Cause of Action, Ms. Hagedorn alleges Defendants Cattani, Esser and Phillips brought groundless, criminal disorderly conduct charges against her in retaliation for engaging in Constitutionally protected speech.

Prosecutor Germano charged Ms. Hagedorn with disorderly conduct, in violation of

Section 648.04(a)(2) of the Village's Codified Ordinances, based on Village resident George Transky's complaint regarding the disruptive, early morning confrontation between Ms. Hagedorn and Officer Esser behind the Service Garage in July 2013.  Section 648.04(a)(2) provides, in part, as follows:

> (a)  No person shall recklessly cause inconvenience, annoyance or alarm to another, by doing any of the following:
>
> * * *
>
> (2)  Making unreasonable noise or an offensively coarse utterance, gesture or display, or communicating unwarranted and grossly abuse language to any person.

Mr. Germano explained during his deposition that he reviewed the facts presented, researched the applicable law, and believed there was probable cause for the disorderly conduct charge. Although the Magistrate Judge ultimately determined, following a bench trial, that Ms. Hagedorn was not guilty of disorderly conduct (reasoning that calling Officer Esser an asshole was protected speech), he noted that probable cause existed to support the Prosecutor Germano's charge.

Furthermore, there is no evidence that Prosecutor Germano was improperly influenced by anyone to charge Ms. Hagedorn with disorderly conduct, or that any of the facts presented by Officer Esser or Mr. Transky supporting the charge were false or fabricated.  Chief Esser states in his Declaration that he presented Mr. Transky's complaint to Prosecutor Germano for review; that he had no input with regard to Prosecutor Germano's decision to charge Ms. Hagedorn with disorderly conduct; and, that Mayor Cattani had no involvement whatsoever in the issuance of the citation and prosecution of Ms. Hagedorn for disorderly conduct.  (Esser Declaration at Paragraphs 6-7.)

-30-

Likewise, Mr. Phillips states in his Declaration that he did not witness any of the events involving Ms. Hagedorn and Officer Esser; did not participate in the investigation which led to the disorderly conduct charge against Ms. Hagedorn; did not sign the charge or present it to Prosecutor Germano; and, did not encourage the Prosecutor Germano to pursue the case against Ms. Hagedorn. (Declaration of David Phillips ("Phillips Declaration") at Paragraphs 4-8.) While Chief Esser recalls Mr. Phillips faxed the paperwork prepared by Chief Esser to Prosecutor Germano for review, Chief Esser states that Mr. Phillips had no substantive involvement in Ms. Hagedorn's citation or prosecution for disorderly conduct. There is no evidence to the contrary.

The disorderly conduct charge filed by Village Prosecutor Germano against Ms. Hagedorn was supported by probable cause. Accordingly, Defendants are entitled to summary judgment as to Ms. Hagedorn's First Cause of Action.

### 2. Telecommunications Harassment

In her Second, Third, Seventh, and Eighth Claims for Relief, Ms. Hagedorn alleges Defendants David Cattani and Geoffrey Esser brought groundless, criminal telecommunications harassment charges against her in retaliation for engaging in Constitutionally protected speech.

Ohio Rev. Code § 2917.21(A)(5) provides, in part, as follows:

No person shall knowingly make or cause to be made a telecommunication or knowingly permit a telecommunication to be made from a telecommunications device under the person's control, to another, if the caller does any of the following:

(5) **Knowingly makes the telecommunication to the recipient of the telecommunication**, to another person at the premises to which the telecommunication is made, or to those premises, **and the recipient or another person at those premises previously has told the caller not to make a telecommunication to those premises or to any persons at those premises.**

-31-

On five separate occasions – October 30, 2014, twice on November 18, 2014, December 15, 2014 and May 22, 2015 – Mayor Cattani notified Ms. Hagedorn that all future email should be sent to his official Timberlake Village email account, not his personal email account. However, Mayor  Cattani continued to receive email from Ms. Hagedorn through his personal account and filed a Police Report with Village Patrolman Hutchinson.

While the First Amendment guarantees Ms. Hagedorn the right to speak out on matters of public concern and express her opinions regarding Mr. Cattani, Mr. Esser, Mr. Phillips, the Village, its Police Department, and other elected officials, it did not give Ms. Hagedorn the unfettered right to continue sending email to Mayor Cattani's private email account after he had instructed her to email him at his official Village email address, nor did Mr. Cattani's status as Mayor prevent him in any way from filing a police report based on activity which he deemed to be personally harassing.  There is no evidence whatsoever to suggest that the information supporting the charges was untrue; that anything unusual or unlawful occurred relative to the presentation of evidence to the Village Prosecutor; or, that Mayor Cattani filed his Statement and Complaint as a way to retaliate against Ms. Hagedorn speaking critically of the Village, its elected officials or the Village Police.

Prosecutor Germano stated during deposition, and in his Declaration, that with regard to each of the charges he filed against Ms. Hagedorn, he reviewed the evidence, applicable law and, in the exercise of his independent professional judgment, determined that there was sufficient probable cause to proceed with the prosecution of the crimes alleged.  (Declaration of Germano at p. 3.)  In each instance, the Willoughby Municipal Court Judge or Magistrate Judge found probable cause for the issuance of a warrant.  There is no evidence to suggest that Prosecutor Germano's decision to pursue charges was influenced by anyone and no evidence of a retaliatory

-32-

motive.

Each of the telecommunications charges filed by Village Prosecutor Germano against Ms. Hagedorn were supported by probable cause.   Accordingly, Defendants are entitled to summary judgment as to Ms. Hagedorn's Second, Third, Seventh, and Eighth Claims for Relief

**V.      Conclusion.**

The Motions for Summary Judgment filed by Defendant, David Phillips (Docket #43), and Defendants, David Cattani and Geoffrey Esser (Docket #44), are hereby GRANTED.

All pending motions are hereby terminated.

This case is hereby TERMINATED.

IT IS SO ORDERED.

s/Donald C. Nugent_____<br>
DONALD C. NUGENT<br>
United States District Judge

DATED:   October 7, 2016_____